# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Amy J. St. Eve | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 9408 | **DATE** | 8/13/2004 |
| **CASE TITLE** | Helzing vs. Loyola University | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion for summary judgment is granted. Status hearing set for 8/25/04 is stricken. Any other pending dates are stricken. Any other pending motions are denied as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| ☐ No notices required, advised in open court. | |
| ☐ No notices required. | number of notices |
| ☐ Notices mailed by judge's staff. | |
| ☐ Notified counsel by telephone. | 8/16/04 date docketed |
| ✓ Docketing to mail notices. | |
| ☐ Mail AO 450 form. | docketing deputy initials |
| ☐ Copy to judge/magistrate judge. | |
| TH ✓ courtroom deputy's initials | date mailed notice |
| | mailing deputy initials |

**Document Number**

U.S. DISTRICT COURT

2004 AUG 13 PM 4: 39

Date/time received in central Clerk's Office

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| WILLIAM HELZING, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    No. 02 C 9408 |
| | ) |
| LOYOLA UNIVERSITY OF CHICAGO, | ) |
| | ) |
| Defendant. | ) |

DOCKETED

AUG 1 ○ 2004

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff William Helzing filed a four count complaint against Loyola University of Chicago ("Loyola"), alleging that Loyola violated his civil rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* Only Counts I and II remain.[1] In Count I, Plaintiff alleges that Loyola discriminated against him on the basis of his gender. In Count II, Plaintiff alleges that Loyola retaliated against him after he complained of the alleged discrimination. For the reasons stated herein, summary judgment is granted in favor of Loyola on both remaining counts.

## LEGAL STANDARDS

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of triable fact exists only if "the evidence

---

[1] On June 30, 2003, the Court dismissed Count III (negligence) and Count IV (negligent hiring, supervision, and retention) for failure to state a claim. (R. 14-1, Minute Order.)

is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica,* 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S. Ct. at 2510. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552 (1986). A party will successfully oppose summary judgment only if it presents "definite, competent evidence to rebut the motion." *Equal Employment Opportunity Comm'n v. Roebuck & Co.,* 233 F.3d 432, 437 (7th Cir. 2000). The Court "considers the evidentiary record in the light most favorable to the nonmoving party, and draws all reasonable inferences in his favor." *Lesch v. Crown Cork & Seal Co.,* 282 F .3d 467, 471 (7th Cir. 2002).

## BACKGROUND

### I.    Loyola's Information Services Department

Loyola hired Plaintiff in 1988 as a Systems Analyst and promoted Plaintiff to Director of Student Information Services ("SIS") in 1996. (R. 39-1, Pl.'s Rule 56.1 Add'l Facts ¶¶ 1-2.) At that time, Plaintiff reported to Al Baldwin, Vice President of Loyola's Information Technology division. (*Id.* ¶ 6.) In March 2001, Loyola replaced Baldwin with Ellen Watson. (*Id.* ¶ 9.) Plaintiff thereafter reported directly to Watson. (*Id.* ¶ 17.)

John Wiet served as Director of the University Business Systems ("UBS") department until Loyola eliminated his position in June 2000 and terminated him. (*Id.* ¶¶ 9-10.) In September 2000, Loyola gave Donna Dorl-Adams the UBS Director position that Wiet formerly

held. (*Id.* ¶ 12.) Loyola did not internally post the UBS Director position as vacant before hiring Dorl-Adams. (*Id.* ¶ 16.)

In 2001, Loyola commissioned the consulting firm Arthur Andersen to study Loyola's departmental structure and to recommend improvements. (*Id.* ¶ 19.) Andersen suggested that Loyola reorganize its Information Services Division. (R. 29-3, Def.'s Rule 56.1 Stmt. ¶ 19.) Based in part on Andersen's reorganization study, Loyola combined the SIS and UBS departments into a single department called the University Business Application Systems ("UBAS") department. (R. 39-1, Pl.'s Rule 56.1 Add'l Facts ¶ 20.) Accordingly, Loyola combined Plaintiff's position as SIS Director and Dorl-Adams's position as UBS Director into a single, new position: UBAS Director. (*Id.*)

## II.    The Interview Process

Loyola invited all of the Directors, including Plaintiff, to apply for the newly-created UBAS Director position. (*Id.* ¶ 22.) Only Plaintiff and Dorl-Adams applied. (*Id.*) Watson was in charge of filling that position. (*Id.*)

On April 5, 2001, Plaintiff sent an email to Watson expressing his belief that Dorl-Adams was unqualified to serve as UBAS Director. (*Id.* ¶ 26.) Plaintiff further stated in the email that "[s]ome, including me, question how Donna [Dorl-Adams] was promoted into her current position, a position that was never posted internally and that was generally understood would not be re-authorized when vacated by John Wiet." (R. 42-3, Pl.'s Exs., Helzing Dep. Ex. A.) Plaintiff did not complain explicitly about gender discrimination in the email and he did not use the word "discrimination." (*Id.*)

On April 10, 2001, Plaintiff met with Watson to discuss the concerns that he expressed in

3

his April 5, 2001 email. (R. 39-1, Pl.'s Rule 56.1 Add'l Facts ¶ 27.) He reiterated his belief that he was qualified to serve as UBAS Director and that Dorl-Adams was not. (*Id.* ¶ 27.) Plaintiff told Watson that he was concerned that he was competing against Dorl-Adams because Loyola had previously selected Dorl-Adams for a position that, in his opinion, she was not qualified to fill. (*Id.*) He did not use the word "discrimination" in this conversation. (*Id.*) During that meeting Watson expressed her concern about Plaintiff's qualifications, and informed Plaintiff that she had heard that Plaintiff had relationship problems with clients on campus. (*Id.* ¶ 35.)

Later that day, Plaintiff sent an email to Watson identifying 29 clients from different groups within Loyola who would attest to Plaintiff's relationship and communications skills. (*Id.* ¶ 42.) Several other Loyola employees sent Watson emails in which they praised Plaintiff's interpersonal and communication skills. (*Id.* ¶ 45.) Watson never contacted any of Plaintiff's 29 references, and she deleted the emails that Loyola employees sent on Plaintiff's behalf. (*Id.* ¶¶ 46, 49.) Watson testified that she did not consider any of this additional, unsolicited information in her final hiring decision because she wanted the selection process to be fair. (*Id.* ¶¶ 48-49.) Watson did not review either candidate's personnel files before the interviews because, she testified, she wanted to look to the future rather than focus on the past. (*Id.* ¶¶ 47, 50.)

Watson instructed Plaintiff and Dorl-Adams to submit "Vision Statements" before their interviews. (R. 29-3, Def.'s Rule 56.1 Stmt. ¶ 28.) Watson considered the candidates' "Vision Statements" when she made her final hiring decision. (*Id.* ¶ 45.)

Watson invited all members of the Faculty Advisory Committee for Information Technology to participate in the interviewing process. (*Id.* ¶ 31.) Only two faculty members volunteered to help Watson interview: Dr. Ed Warro (a male), Loyola's Dean of Libraries, and

4

Dr. Mary Boyd (a female), chair of the Faculty Advisory Committee for Information Technology and a member of the Information Technology University Policy Committee. (*Id.* ¶ 29.) Dr. Warro did not participate in the interviews because issues had arisen in the library at the last minute that required his immediate attention. (*Id.* ¶ 30.)

On May 16, 2001, Watson and Dr. Boyd interviewed Plaintiff and Dorl-Adams. (*Id.* ¶ 29.) Watson and Dr. Boyd asked Plaintiff and Dorl-Adams the same five questions during their respective interviews. (*Id.* ¶ 30.) Both interviews lasted the same amount of time (approximately one hour), and both candidates were given approximately the same amount of time in which to address Watson and Dr. Boyd. (*Id.*)

### III.    Loyola Hires Dorl-Adams

After interviewing Dorl-Adams and Plaintiff, Watson and Dr. Boyd selected Dorl-Adams for the UBAS Director position. (R. 39-1, Pl.'s Rule 56.1 Add'l Facts ¶ 52.) Watson testified that she and Dr. Boyd selected Dorl-Adams because Dorl-Adams's interview responses were very forward and very positive, she understood the relationship between UBAS and the other groups, she generally presented a clearer view than Plaintiff of where the organization needed to be going, and her performance at the interview was better than Plaintiff's. (R. 29-3, Def.'s Rule 56.1 Stmt. ¶¶ 33-34.) Watson further testified that she and Dr. Boyd did not select Plaintiff because Plaintiff focused narrowly on Student Information Services rather than addressing the broad spectrum of enterprise systems, he focused on the past rather than being future-oriented, and he was very defensive in responding to questions. (*Id.* ¶ 35.)

On May 21, 2001, Watson informed Plaintiff that she and Dr. Boyd did not select him for the UBAS Director position and told him the reasons why. (*Id.* ¶ 36.) Loyola then gave Plaintiff

a position as a Manager in the new UBAS department. (*Id.* ¶ 17.) As a Manager, Plaintiff received the same salary that he received as SIS Director, but he received fewer benefits. (*Id.* ¶¶ 17-18; R. 39-1, Pl.'s Rule 56.1 Add'l Facts ¶ 114.) In his new position, Plaintiff reported to Dorl-Adams. (R. 39-1, Pl.'s Rule 56.1 Add'l Facts ¶ 52.)

## IV. Plaintiff's Complaint And Loyola's Internal Investigation

On August 6, 2001, Dorl-Adams sent Plaintiff an email in which she stated that in May 2001, Watson had given Plaintiff a "6 month window (beginning 7/1/01) in which to show significant improvements in your work." (R. 45-1, Def.'s Supplemental Exs., Ex. 32.) Plaintiff testified that he was shocked when he read the email because no one had ever discussed a six month window with him.[2] (R. 39-1, Pl.'s Rule 56.1 Add'l Facts ¶ 52.)

The next day, Plaintiff complained to Thomas Kelly, Loyola's Vice President of Human Resource Management, that he was being discriminated against because he is male. (*Id.* ¶¶ 72-73.) Plaintiff testified that he complained to Kelly because he felt that the only reason Watson and Dorl-Adams would "conjure up" a story about a six month window was to set him up to be fired. (*Id.* ¶ 73.) On August 9, 2001, Kelly responded to Plaintiff, and advised him that either Kelly or Mimi Winter, Loyola's Director of Human Resources, would get back to Plaintiff after they investigated the issues that Plaintiff raised. (*Id.* ¶ 74.)

During her investigation, Winter interviewed Dr. Boyd, Dorl-Adams, Dale Moyer,

---

[2] It is undisputed, however, that at least as early as August 6, 2001, Plaintiff knew that his supervisors were giving him six months to improve his work performance. (R. 44-1, Def.'s Resp. to Pl.'s Add'l Facts ¶ 72.) Further, it is undisputed that Loyola terminated Plaintiff on February 8, 2002, which is six months from August 6, 2001, not six months from May, 21 2001. (R. 39-1, Pl.'s Rule 56.1 Add'l Facts ¶ 158.) Therefore, Dorl-Adams's August 6, 2001 email cured any misunderstanding that Plaintiff may have had concerning the six month window.

Watson, and Plaintiff. (R. 30-1, Def.'s Exs. In Supp. Of Summ. J., Ex. 24.) On August 23,

2001, Plaintiff gave Winter a letter setting forth more details about his discrimination and

retaliation claims. (*Id.* ¶ 85.) Winter completed her investigation on September 6, 2001, and

memorialized her findings in a memo dated August 21, 2001.[3] (R. 44-1, Def.'s Resp. to Pl.'s

Add'l Facts ¶ 81.) Winter concluded that gender discrimination or retaliation did not motivate

Loyola to select Dorl-Adams as UBAS Director instead of Plaintiff. (R. 39-1, Pl.'s Rule 56.1

Add'l Facts ¶ 87.) On September 13, 2001, Winter met with Plaintiff to discuss her investigation

and her conclusions. (*Id.*)

On September 17, Plaintiff filed an EEOC charge against Loyola for gender

discrimination and retaliation. (*Id.* ¶ 117.)

## V.     Loyola's Assessment Of Plaintiff's Work Performance

Between June and September 2001, Dorl-Adams met regularly with Plaintiff to monitor

and assess his work performance. (R. 29-3, Def.'s Rule 56.1 Stmt. ¶ 43.) On September 24,

2001, Watson met with Plaintiff regarding his work performance and told him that she expected

Plaintiff to meet certain measurable goals, objectives, and associated timelines for key SIS

projects. (R. 39-1, Pl.'s Rule 56.1 Add'l Facts ¶ 126.) She reiterated that relationships are a key

element of customer service, and that she expected Plaintiff's relationships with all SIS users to

be "characterized by professional courtesy and respect." (R. 29-3, Def.'s Rule 56.1 Stmt. ¶ 43.)

At the end of the meeting Watson gave Plaintiff a memo purporting to memorialize what they

had discussed. (R. 39-1, Pl.'s Rule 56.1 Add'l Facts ¶ 126.)

---

[3] It is undisputed that Winter began her investigation on August 21, 2001, and that she
mistakenly failed to update the date on the memorandum to reflect the fact that she completed
her investigation on September 6, 2001. (R. 44-1, Def.'s Resp. to Pl.'s Add'l Facts ¶ 81.)

On November 6, 2001, Plaintiff wrote a letter to Watson and Winter disputing the points in Watson's September 24, 2001 memo. (*Id.* ¶ 128.) Specifically, Plaintiff disputed that Watson gave him a six month window on May 21, 2001, and complained about the lack of "specific feedback and honest, constructive communication." (R. 39-1, Pl.'s Rule 56.1 Add'l Facts ¶ 128; R. 42-3, Pl.'s Exs., Helzing Dep. Ex. 35.) Plaintiff further disputed the factual basis of several of Watson's assessments of him. (R. 39-1, Pl.'s Rule 56.1 Add'l Facts ¶ 128.)

## VI.    Computer System Outages

On November 15, 2001, two outages occurred with the TTR and Quikchek student registration systems. (R. 39-1, Pl.'s Rule 56.1 Add'l Facts ¶ 136.) Dorl-Adams sent Plaintiff a memo criticizing Plaintiff for his response to the outages. (*Id.*) Dorl-Adams acknowledged that the outages were not Plaintiff's fault. (*Id.* ¶ 137.) Claire Korinek, Interim Registrar, testified that she found Plaintiff responsive and that she thought that Plaintiff worked hard to correct the outage problem. (*Id.* ¶ 138.)

On December 14, 2001, Plaintiff sent Dorl-Adams a letter disputing the points raised in Dorl-Adams's November 15, 2001 memo. (*Id.* ¶ 140.) He attached documentation in a "Black Binder" purporting to dispute the basis of her criticism. (*Id.*)

## VII.   Plaintiff's Review

On November 14, 2001, Watson sent Plaintiff a memo indicating that she wanted to meet with him in mid-December to discuss his progress in meeting his performance objectives that he and Dorl-Adams previously developed and the behavioral objectives that he and Watson discussed on September 24, 2001. (R. 29-3, Def.'s Rule 56.1 Stmt. ¶ 48.)

On November 16, 2001, Watson and Kelly met to discuss whether Plaintiff's pattern of

performance warranted his termination. (*Id.* ¶ 53.) Kelly advised Watson to continue to work with Plaintiff to try to improve his performance. (*Id.*)

Also on November 16, 2001, Dorl-Adams gave Plaintiff a copy of his written performance review, and Plaintiff added his comments disagreeing with her assessment of his work performance. (R. 39-1, Pl.'s Rule 56.1 Add'l Facts ¶ 132.) On November 19, 2001, Dorl-Adams and Plaintiff met to discuss the review. (*Id.*) Watson attended Plaintiff's review, but did not attend the reviews of the other three Managers. (*Id.* ¶ 131.)

On December 14, 2001, Plaintiff sent Kelly another letter and included a copy of the Black Binder in which he purported to refute Dorl-Adams's criticism of him with respect to the outages. Kelly never responded to the December 14 letter. (*Id.* ¶¶ 148-49.)

On December 18, 2001, Watson met with Plaintiff to review his progress in meeting the previously-established employment expectations, goals, and objectives. (R. 29-3, Def.'s Rule 56.1 Stmt. ¶ 54.) Dorl-Adams and Winter also attended the meeting. During the meeting, Watson notified Plaintiff of his continuing failures and problems in relationships with vendors, relationships with internal customers, and his failures and problems with general management principles and procedures regarding documentation, system support, escalation and acceptance of responsibility. (*Id.*) Watson informed him that because of his continuing performance problems she was extending his review and assessment period for an additional 30 days, after which time she would make a final recommendation regarding Plaintiff's future role with Information Services. (*Id.* ¶ 54.) Plaintiff argues that these assessments are baseless. (R. 39-1, Pl.'s Rule 56.1 Add'l Facts ¶¶ 142-50.)

On January 10, 2002, Plaintiff wrote Kelly another letter, asking for Kelly's help because

the alleged harassment was worsening. (*Id.* ¶ 150.) On January 14, 2002, Plaintiff emailed

Watson, basically pleading with her for his job. (*Id.* ¶ 151.)

## VIII.  Plaintiff's Termination

On February 8, 2002, Kelly terminated Plaintiff based on his review of the materials in

Plaintiff's personnel file and Watson's recommendation. (*Id.* ¶ 158.) Kelly was the ultimate

decision-maker in terminating Plaintiff's employment. (R. 29-3, Def.'s Rule 56.1 Stmt. ¶ 57.)

After Loyola terminated Plaintiff, members of the department -- mostly males --

performed Plaintiff's work duties. (*Id.* ¶ 61.) Watson interviewed and ultimately hired Kevin

Smith, a male, to replace Plaintiff. (*Id.* ¶ 62.)

## ANALYSIS

## I.    Plaintiff Cannot Prevail On His Reverse Gender Discrimination Claim (Count I)

Plaintiff bases his reverse gender discrimination claim on "the selection of Dorl-Adams

over [Plaintiff] for Director UBAS." (R. 40-1, Pl.'s Mem. in Opp. to Summ. J. at 11.)

A plaintiff bringing a claim under Title VII can prove discrimination using either the

"direct" method or the indirect, burden-shifting method outlined by the Supreme Court in

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817 (1973).  *Cerutti v. BASF*

*Corp.,* 349 F.3d 1055, 1060-61 (7th Cir. 2003). Plaintiff sets forth no direct evidence of

discrimination. (R. 40-1, Pl.'s Mem. in Opp. to Summ. J. at 11 ("[T]his is not a direct evidence

case.").) It is undisputed that neither Watson, Dorl-Adams, Kelly, nor Dr. Boyd ever made any

gender-related comments to or about Plaintiff. (R. 41-1, Pl.'s Rule 56.1 Resp. ¶ 67.)

Accordingly, to survive summary judgment on his reverse gender discrimination claim, Plaintiff

must establish a *prima facie* case of discrimination under the burden-shifting method of

*McDonnell Douglas.*

## A. Plaintiff Cannot Establish A *Prima Facie* Case Of Discrimination

To establish a *prima facie* case of reverse gender discrimination based on Loyola's failure

to hire Plaintiff as UBAS Director, Plaintiff must show that: (1) background circumstances exist

which support an inference that Loyola is one of those unusual employers who discriminates

against the majority;[4] (2) Plaintiff applied for, and was qualified for, an open position; (3) he was

rejected; and (4) Loyola filled the position with an individual outside of Plaintiff's class, or the

position remained vacant. *Bennett v. Roberts*, 295 F.3d 687, 694 (7th Cir. 2002); *Mills v. Health

Care Serv. Corp.*, 171 F.3d 450, 454 (7th Cir. 1999).

If Plaintiff establishes a *prima facie* case, the burden of production shifts to Loyola to

produce a legitimate, non-discriminatory reason for its hiring decision. *Texas Dep't of

Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S. Ct. 1089 (1981); *Bennett*, 295 F.3d at

694. Loyola must produce "evidence which, taken as true, would permit the conclusion that

there was a nondiscriminatory reason for the adverse action." *St. Mary's Honor Center v. Hicks,*

509 U.S. 502, 509, 113 S. Ct. 2742 (1993). If Loyola sets forth a legitimate justification for its

action, the burden then shifts back to Plaintiff to prove that Loyola's reason is a pretext for

---

[4] In reverse discrimination cases, the Seventh Circuit modified the first element of the
*McDonnell Douglas* framework because a white male plaintiff necessarily is not a "member of a
protected class." *Mills*, 171 F.3d at 454 ("Invidious discrimination against [white] men is
relatively uncommon in our society, and so there is nothing inherently suspicious in an
employer's decision to promote a qualified minority [or female] applicant instead of a qualified
[male] applicant."). Thus, to prevail on his reverse discrimination claim, Plaintiff must
demonstrate "background circumstances" that "support an inference that the defendant is one of
those unusual employers who discriminates against the majority." *Id.* at 455. Background
circumstances in reverse discrimination suits essentially substitute for the first element of the
*prima facie* case in typical discrimination suits, in which women and minorities must prove that
they are members of a protected class. *See id.*

discrimination. *Texas Dep't of Community Affairs,* 450 U.S. at 255-56. The ultimate burden of persuasion remains at all times with Plaintiff. *St. Mary's Honor Center,* 509 U.S. at 507.

### 1. Plaintiff Provides No Legal Authority To Support His *Prima Facie* Case

Plaintiff fails to provide any legal support showing that he has established a *prima facie* case of discrimination. Instead, Plaintiff provides the following conclusory paragraph:

> Plaintiff was meeting defendant's legitimate performance expectations and was qualified for the position of Director UBAS. A female who did not meet the minimum qualifications was selected over him in an extremely subjective, highly informal, and totally baseless process that included ignoring a review of pertinent evidence that any reasonable employer would have looked at when making an employment decision such as this. Under these facts, plaintiff has a *prima facie* case of sex discrimination in the selection of Dorl-Adams over him for Director UBAS.

(R. 40-1, Pl.'s Mem. In Opp. To Summ. J. at 11.) This is improper. Plaintiff must provide legal authority in support of his arguments and must contest the legal authority advanced by Loyola in order to sufficiently rebut Loyola's arguments. *Anderson v. Hardman,* 241 F.3d 544, 545 (7th Cir. 2001). "A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point." *Pelfresne v. Village of Williams Bay,* 917 F.2d 1017, 1023 (7th Cir. 1990).

Nonetheless, the Court has attempted to discern Plaintiff's intended *prima facie* case based on the facts that he submitted in his Rule 56.1 statements. Viewing those facts in the light most favorable to Plaintiff, it is clear that Plaintiff cannot establish a *prima facie* case because he cannot show that Loyola is one of those unusual employers who discriminates against the majority. Moreover, even if Plaintiff were able to establish a *prima facie* case, he cannot prevail on his discrimination claim because Loyola articulated a legitimate reason for its hiring decision

12

and Plaintiff cannot establish that that reason was a mere pretext for discrimination.

### 2. Plaintiff Cannot Establish "Background Circumstances"

A plaintiff in a reverse discrimination case must establish "background circumstances" that "support an inference that the defendant is one of those unusual employers who discriminates against the majority," thus shifting the burden to the defendant to articulate a legitimate reason for its hiring decision. *Mills*, 171 F.3d at 454 (citation omitted). Plaintiff does not attempt to establish background circumstances and does not attempt to contest Loyola's argument.

Loyola argues that the facts viewed in the light most favorable to Plaintiff cannot support an inference that Loyola discriminates against the majority. The Court agrees. It is undisputed that before Loyola selected Dorl-Adams instead of Plaintiff for the UBAS Director position, three of the four Directors in the Information Services Division, including Plaintiff, were males. After Loyola selected Dorl-Adams as UBAS Director, two of the three Directors in the Information Services Division were males, and three of the four Managers employed in the new UBAS Department, including Plaintiff, were males. After Loyola terminated Plaintiff, Watson interviewed and hired Kevin Smith, a male, to replace Plaintiff. After Loyola eliminated the UBAS Director position and terminated Dorl-Adams in 2003, the remaining two Director positions in the Information Services Division were both held by males. Finally, no other male manager in the department ever claimed or complained that Watson or Dorl-Adams discriminated against them because they are male.

Plaintiff has produced no evidence that would support an inference that Loyola discriminated against the majority. Plaintiff proffered no evidence, for example, that the person

13

with hiring authority expressed intense interest in hiring a female or that there was a pattern of hiring females in the past, *cf. Duffy v. Wolle*, 123 F.3d 1026, 1036-37 (8th Cir. 1997), or that Plaintiff was the only male in the department and nearly all of the decision-makers were female, *cf. Reynolds v. School Dist. No. 1, Denver, Colorado*, 69 F.3d 1523, 1534 (10th Cir. 1995). No reasonable jury could conclude, based on these facts, that Loyola was the unusual employer who discriminates against the majority.

**B.      Loyola Has Articulated Legitimate, Non-Discriminatory Reasons For Its Hiring Decision**

Even if Plaintiff were able to establish a *prima facie* case, his discrimination claim fails because Loyola has articulated a legitimate, non-discriminatory reason for its hiring decision, and Plaintiff cannot establish that Loyola's proffered reason is a mere pretext for discrimination.

Loyola explains that it hired Dorl-Adams rather than Plaintiff because Watson and Dr. Boyd believed that Dorl-Adams's interview responses were very forward and very positive, she understood the relationship between UBAS and the other groups, she generally presented a clearer view than Plaintiff of where the organization needed to be going, and her performance at the interview was better than Plaintiff's. In contrast, Watson and Dr. Boyd felt that Plaintiff focused too narrowly on Student Information Services rather than addressing the broad spectrum of enterprise systems, he focused on the past rather than being future-oriented, and he was very defensive in responding to questions.

Watson further testified that she did not contact any of Plaintiff's references or consider the emails from other Loyola employees on Plaintiff's behalf because she wanted the selection process to be fair. Further, she testified that she did not review the candidates' personnel files

14

before the interview because she wanted to focus on the future, which is why she required the candidates to submit "Vision Statements."

Plaintiff contends that Loyola cannot articulate a legitimate reason for its hiring decision "because the process was so tainted, so subjective, so awry, that the defendant's articulated reason cannot be deemed legitimate." (R. 40-1, Pl.'s Mem. in Opp. to Summ. J. at 11.) Plaintiff fails, however, to support this contention with any legal authority, and he does not attempt to contest Loyola's cited legal authority. Indeed, Plaintiff's "analysis" of this point consists of six conclusory sentences without any citations to authority.

Loyola bears only a burden of production, not persuasion. *St. Mary's Honor Center*, 509 U.S. at 509. Loyola has met that burden by articulating a non-discriminatory reason to rebut the inference of discrimination arising out of Plaintiff's *prima facie* case.[5] *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 463-64 (7th Cir. 1986).

### C.    Plaintiff Cannot Establish Pretext

"Pretext means a dishonest explanation, a lie rather than an oddity or error." *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002). Thus, to demonstrate pretext, Plaintiff "must show more than that the employer's decision was incorrect; the plaintiff must also show the employer lied about its proffered explanation." *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 732 (7th Cir. 2001); *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 348 (7th Cir 1997). Plaintiff fails to establish facts to support an inference that Loyola's proffered reasons for hiring Dorl-Adams as UBAS Director are lies.

---

[5] The Court notes that Plaintiff has not established a *prima facie* case.

15

Plaintiff essentially argues that the interview process was "bizarre" and "strange." (*See* R. 40-1, Pl.'s Mem. in Opp. to Summ. J. at 11-12.) A plaintiff cannot establish pretext, however, if the employer "honestly believed in the nondiscriminatory reasons it offered, even if the reasons are foolish or trivial or even baseless." *Hartley v. Wisconsin Bell, Inc.*, 124 F.3d 887, 890 (7th Cir. 1997); *see also Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 677 (7th Cir. 1997) ("[A] reason honestly described but poorly founded is not a pretext as that term is used in the law of discrimination."). The issue is whether Loyola honestly believed its assessment of which candidate was best suited for the position. An employee has no right to dictate how an employer should conduct an interview or by what criteria the employer should evaluate candidates, and the Court does not either, so long as the interview method and hiring criteria are not motivated by discriminatory animus. *See Dale*, 797 F.2d at 464 ("[A] court may not sit as a super-personnel department."). Plaintiff complains that the interview process was "unfair" and "overly subjective," but "Title VII does not prohibit unfairness or wrongheaded decisions in the workplace." *Johnson v. Hondo, Inc.*, 125 F.3d 408, 415 (7th Cir. 1997). "No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers," if the alleged discrimination is not because of Plaintiff's gender, "Title VII [will] not interfere." *Pollard v. Rea Magnet Wire Co., Inc.*, 824 F.2d 557, 560-61 (7th Cir. 1987). Plaintiff has provided no evidence to support an inference that Watson and Dr. Boyd were motivated by considerations of gender and that they did not honestly believe that Dorl-Adams was the best candidate for UBAS Director.

Accordingly, summary judgment is granted in favor of Loyola as to Plaintiff's reverse gender discrimination claim.

16

## II.    Plaintiff Cannot Prevail On His Retaliation Claim (Count II)

Because Plaintiff has no direct evidence of retaliation, he must proceed under the

*McDonnell Douglas* burden-shifting method in order to prevail on his retaliation claim.  Plaintiff

must show that "(1) after lodging a complaint about discrimination, (2) only he, and not any

otherwise similarly situated employee who did not complain, was (3) subjected to an adverse

employment action even though (4) he was performing his job in a satisfactory manner; unless

(5) the defendant presents evidence of a reason (good or bad, provided only that it is not one that

the law forbids) for the adverse action."  *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d

640, 642 (7th Cir. 2002).  An adverse action is essential for a retaliation claim.  *Johnson v.*

*Cambridge Indus., Inc.*, 325 F.3d 892, 899-902 (7th Cir. 2003).

Plaintiff fails to clearly articulate the basis for his retaliation claim.  Rather than

identifying specific adverse actions and particular acts of retaliation, he broadly states that

"Plaintiff's case of retaliation is strong and encompassing.  It extends from the selection of Dorl-

Adams and all the way through Plaintiff's termination."  (R. 40-1, Pl.'s Mem. in Opp. to Summ.

J. at 12.)  The Court has attempted to identify the "protected activity" Plaintiff claims to have

engaged in as well as the actions that he considers to be adverse.

For purposes of summary judgment, the Court determines that Plaintiff engaged in

protected activity by complaining of reverse discrimination in his April 5, 2001 email to Watson,

his April 10, 2001 meeting with Watson,[6] his August 7, 2001 email to Kelly, and his September

---

[6]  It is undisputed that Plaintiff did not use the word "discrimination" in either the April 5, 2001
email or the April 10, 2001 meeting.  Instead, Plaintiff stated that he was concerned that he was
competing against Dorl-Adams because Loyola had previously selected Dorl-Adams for a
position that, in Plaintiff's opinion, she was not qualified to fill.  Plaintiff argues that he meant to

17, 2001 EEOC charge.

Plaintiff cannot establish a *prima facie* case of retaliation under these facts. He cannot show that he was meeting Loyola's legitimate expectations at the time of any adverse actions.

## A.    Adverse Actions

An adverse employment action involves a significant change in employment status such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. *Fortier v. Ameritech Mobile Communications, Inc.*, 161 F.3d 1106, 1112 n.7 (7th Cir. 1998). An adverse employment action is one that significantly alters the terms and conditions of the employee's job, *Stutler v. Ill. Dep't of Corr.*, 263 F.3d 698, 703 (7th Cir. 2001). "[N]ot everything that makes an employee unhappy is an adverse action." *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996).

Loyola's decision not to hire Plaintiff as UBAS Director and instead to give him a position as Manager is an adverse action because he suffered a reduction in benefits. Similarly, Plaintiff's termination is clearly an adverse action. The other actions that Plaintiff raises, however, do not qualify as "adverse actions" under Title VII.

The fact that Plaintiff felt "overworked" is not an adverse employment action. *See Griffin v. Potter,* 356 F.3d 824, 829 (7th Cir. 2004) (neither change of shift, lengthened commute, unfair discipline, unfavorable evaluation, difficult assignments, refusal to approve annual leave request,

---

convey to Watson that he feared that Loyola engaged in reverse discrimination in the past by promoting an unqualified female over a more qualified male, and that he feared that he was about to become the next victim of reverse gender discrimination because he was now competing against the same unqualified female. Although Plaintiff could have more clearly articulated the basis of his "complaints," for purposes of summary judgment, the Court assumes that Plaintiff engaged in protected activity on those dates.

nor denial of parking permit constitutes adverse action); *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 691-92 (7th Cir. 2001) (additional job responsibilities do not qualify as adverse actions). Loyola's refusal to give Plaintiff severance pay under the Work Force Reduction Policy is not an adverse action. It is undisputed that Plaintiff did not qualify for severance pay under the policy either when Loyola gave him the Manager position or when Loyola terminated him. The fact that one of Plaintiff's subordinate placed a "man-hating" cartoon on his desk is not an adverse action because it did not alter the terms or conditions of Plaintiff's employment. Finally, Loyola's refusal to allow him to attend a training seminar in February 2002 is not an adverse action with tangible job consequences because Loyola terminated Plaintiff on February 8, 2002.

Accordingly, the only adverse actions that are relevant to Plaintiff's retaliation claim are 1) Loyola's decision to hire Dorl-Adams instead of Plaintiff as UBAS Director and 2) Plaintiff's termination. As discussed in Section I.B., however, Loyola gave legitimate, non-discriminatory reasons for hiring Dorl-Adams as UBAS Director, and Plaintiff cannot show that these reasons were pretextual. Even if Plaintiff were able to establish a *prima facie* case of retaliation, therefore, he cannot show that Loyola retaliated against him for complaining to Watson on April 5, 2001 and April 10, 2001 by hiring Dorl-Adams instead of Plaintiff. Accordingly, the only remaining issue is whether Loyola retaliated against Plaintiff by firing him.

### B. Plaintiff Cannot Establish That He Was Meeting Loyola's Legitimate Expectations

Loyola submitted substantial documentation detailing Plaintiff's poor performance, supporting its contention that Plaintiff's supervisors had a negative assessment of Plaintiff's work performance.

Plaintiff essentially argues that he was a good employee for thirteen years and that Dorl-Adams and Watson's negative assessments of his performance are baseless and unreasonable. Plaintiff further argues that he could not possibly meet the performance goals that Loyola set for him because he was overworked and those goals were "impossible" to meet. He provides evidence that other employees who were not his superiors had a positive assessment of his work performance.

Plaintiff's own subjective beliefs about his own abilities are irrelevant. *See Gustovich v. AT&T Communications, Inc.*, 972 F.2d 845, 848 (7th Cir. 1992); *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1460 (7th Cir. 1994). Similarly, the beliefs and opinions of non-supervisors, such as Claire Korinek, are irrelevant. *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 337-38 (7th Cir. 1991) ("It is the perception of the decision maker which is relevant."). Moreover, Plaintiff's evidence about his favorable reviews in the past are irrelevant. "[W]hether one is qualified may change from time to time. The fact that an individual may have been qualified in the past does not mean that he is qualified at a later time." *Grohs v. Gold Bond Bldg. Prods.*, 859 F.2d 1283, 1287 (7th Cir. 1988).

### C. Plaintiff Cannot Establish That Loyola's Legitimate Reason For Firing Him Was Pretextual

Even if Plaintiff were able to establish a *prima facie* case, which he cannot, he would not be able to establish that Loyola's reasons for firing him were pretextual.

Plaintiff's well-documented problems with his communication skills, his inability to complete his objectives as requested and to perform his assigned work duties as required, and his problems in dealing with vendors and other University personnel are all legitimate, non-

retaliatory reasons for his termination. *Grohs*, 859 F.2d at 1287-88 (unacceptable performance and management style is a legitimate, non-discriminatory reason for termination, not a pretext for discrimination); *La Montagne v. American Convenience Prods., Inc.*, 750 F.2d 1405, 1414 (7th Cir. 1984) (plaintiff's problems in communicating with supervisors is a legitimate non-discriminatory reason for termination). Plaintiff has presented no evidence that Loyola in general, or Kelly in particular, did not honestly believe that Plaintiff's performance as Manager was deficient at the time Loyola terminated Plaintiff. Indeed, Plaintiff cites *no cases* in support of his retaliation claim. (*See* R. 40-1, Pl.'s Mem. in Opp. to Summ. J. at 12-15.)

Accordingly, summary judgment is granted as to Plaintiff's retaliation claim.

## CONCLUSION

Summary judgment is granted in favor of Loyola as to Count I (reverse gender discrimination) because Plaintiff has no direct evidence of reverse gender discrimination and cannot establish a *prima facie* case. Summary judgment is granted in favor of Loyola as to Count II (retaliation) because Plaintiff has failed to establish that he was meeting Loyola's expectations. Loyola's motion to strike Plaintiff's additional facts (R. 37-1) is denied as moot.

DATED:   August 13, 2004

_____
AMY J. ST. EVE
United States District Court Judge

21